1-23-166, 1-23-167, United States of America, Mrs. Terrence Walker, Argument of Non-Conceit, 15 minutes per side, Court of Proceedings. Cassio. Cassio. 4 o'clock. Judge Gibbons, I'd like to reserve 3 minutes for one cast. May it please the Court, Justice Cassio for defendant Terrence Walker. Mr. Walker was convicted of possession of ammunition that was lodged inside a gun. It was, in turn, inside someone else's car, which Mr. Walker was not driving at the time of his arrest. Mr. Walker's conviction was upheld, notwithstanding that there was no testimony below that anyone ever saw Mr. Walker handle that gun or the ammunition contained therein, and notwithstanding that the gun, the ammunition, and the magazine containing the ammunition were all submitted to the Cincinnati Police Crime Lab for fingerprint testing, and Mr. Walker's fingerprints were not found on any of those items. Finally, Mr. Walker was convicted, notwithstanding that there was no testimony in this case that the gun was within Mr. Walker's plane's sight or ever would have been within Mr. Walker's plane's sight. Instead, the key point connecting Mr. Walker to this ammunition in the mind of the government, and as the government presented below, was testimony not only that the gun was, quote, in the backseat with the handle angled up towards the back, and that Mr. Walker, in response to commands to get out of the car, take off his seatbelt, keep his hands in view, and stop, apparently all at the same time, made a deliberate motion along the lower side of his torso, turning his body away from officers at a driver's side door towards officers at the passenger's side door. Well, you know, the jury might have, in fact, focused, though, as it apparently did, on the fact that that was rather an unnatural response to a rather specific set of instructions about what Mr. Walker was supposed to do. I will say that one of the police officers did testify that the response was, in his mind, unnatural. I'm not sure that I would agree with the characterization as unnatural in that Mr. Walker was, the officer's testimony conflicted as to exactly what Mr. Walker was told to do. He was told to get out of the car. He was told to keep his hands in view. He was told to stop. He was told to release his seatbelt. In that circumstance, I'm not necessarily certain that it would be unnatural to move deliberately. But you have a tough standard here. You know, I mean, coming up and saying it's not necessarily certain that this shows he had possession or control doesn't get it done for you. I mean, so a jury found that he possessed the weapon. And so the question before us is whether any rational jury could find that he had immediate possession or control, I guess, of the ammo in this 9mm that's wedged in the seat between the door. Correct? That's a fair statement of the issue, isn't it? Yes, Your Honor, with the caveat that under this Court's decision in United States v. Bailey, I think you've stated actual possession. Right. Constructive possession. Is that what was instructed here? Constructive or actual? I thought it was actual. The government has attempted to defend this as an actual possession case. Well, suppose they're wrong. Was the jury given, I mean, it would be typical to instruct the jury on both definitions. Is that what happened here? That's correct. We do not object. We accept the conviction on either actual or constructive. Okay. So either one. We don't believe that the evidence was sufficient. And that's right. I was referring to actual. But constructive is he knowingly has the power and the intention at a given time to exercise dominion. Is that right? That's correct. That's constructive. Okay. And so the question is whether any rational jury on this record could reach that conclusion. We start with the fact that the gun is wedged into the seat inches away, pretty close to U.S. v. Morrison. I know that case said, you know, it was probably rubbing up against him. I don't know that you would say that's a sine qua non for our decision in that case, the rubbing up against thing. I mean, you know, this is almost in the same location. We don't know if it's rubbing, but it's pretty darn close. Start with that. I mean, the location of the gun. Answer that point, because the way you started suggested it was more in the back seat. If we read the inferences in favor of the verdict, do you agree with Judge Kethledge that it's next to him and, if not rubbing his hip, pretty close? I don't believe that that's the case, Your Honor. And I don't believe it because the only testimony as to the location of the gun came from Officer Lowry, who saw the gun. Officer Lowry's quote was, was it in the back seat? Yes. I thought the testimony, she was looking through the back door from the angle of the back seat. I didn't think she said. If that were true, why would she have not just grabbed the gun and just not started yelling and gun? She did grab the gun, Your Honor. Well, but who needs to do anything? Is it a good idea to let the criminal know you see the gun? Just grab the gun and then say, we got him. Don't worry. Well, I would refer the court to the transcript at 490 at 4 through 7, which I'll read out. This is the questioning of Officer Lowry. Q, was it in the back seat? A, yes, and it was. It was, yeah, the handle was like towards the back seat, like where you could reach and grab it and come up with it like it was a normal pull. I recognize there's good things and bad things. The handle was towards the back seat. Correct. It doesn't really, that doesn't really say how the gun was exactly positioned, but it's not really, it was in the back seat. It's really a reference to the positioning of the handle, right? Well, I think her answer was, was it in the back seat? Yes. And then she goes on to say that it was angled up so that the handle was pointed towards the back seat. How could it be angled up if it was, are you saying it's between the back seat cushion and this back seat door? I think. Is that what you're saying she's saying? I'm saying she's saying that it's sort of, you know, the seat belt clasp on a car comes next to the seat. Yeah. It was sort of towards the back side of that and the handle was angled up towards the back seat. I mean, I understood this to be that it is wedged next to the front passenger seat, but that it might be angled, the handle, I guess, toward, not in, toward the back seat. I mean, couldn't a jury draw that conclusion, I guess? We could dispute that, but let me accept that for a second and see if I can distinguish Morrison on anything. Sure, yeah. I think that in Morrison, you certainly have testimony if the gun is rubbing up against the gentleman, there is no way. That was the court's wild speculation, I guess, in that case, but I'm just sort of joking around. But, I mean, that wasn't testimony. That was a characterization of the record, wasn't it? In fairness, I believe that I would have to refer to the testimony in the lower court in the United States versus Morrison, but the findings of the court were that the gun was rubbing up against the man if it were in a holster. Let's say you're right about that because you probably are. Go ahead. If that were the case, then I think that the unavoidable conclusion would be that Mr. Morrison knew that that gun was there. Right. It's not possible to have a gun rubbing up against you and not know that the gun is there. Sure. I'd come pretty close to saying there's a corollary to that rule. It's pretty hard not to notice a gun wedged into the seat right next to you. Well, again, Your Honor, I think that it would, to some extent, depend on where that gun was. That's why I was asking that, but I think the point that the handle's up facing back, just two options. It's wedged into the back seat next to the door or the front seat next to the door. I just don't understand any other option, and I think the plausible one for the jury is the front seat. I don't know. It seems pretty unusual not to know it's there. Well, I would point out that the only officer who saw this weapon was the officer who opened up the back door. The officers at the driver's side went in and opened the door. But they never had an angle. No one else had an angle. You would have the angle from the back door, wouldn't you, if it was as Judge Sutton described? And the people next to them couldn't have seen it because the door blocked their view. The door wasn't open. That is possible. The door wasn't open. Oh, sorry, sorry. I'm just saying the only person who could have seen it did see it. I'm just not sure we can draw much from the fact that other officers didn't see it. I don't know how they could have seen it. If the court is inclined to credit that inference, I'd like to move on to my second issue, then, in that respect. Okay, well, let me ask you this question. I mean, if, in fact, the record indicates that it is the passenger seat, not the back seat, the front passenger seat that it's wedged next to, would you concede that the jury could infer that Mr. Walker knows that when it's so close to him? I would dispute that on the ground that we're not writing on a blank slate and refer the court not to Morrison, but instead to the United States. But to Bailey. Bailey. But it's under the front seat in Bailey, which is different. That is true. It is under the front seat in Bailey. However, Bailey was the driver of the car, controlling the genesis of that car. Well, okay, I understand. Okay, so let me, and I understand, so I just, so you do argue that that's not enough. But then when we add in the fact of this unusual movement, which, as I understand it, and please correct me if I'm wrong, ends with his hands, they must have been in very close proximity to the weapon. Unquestionably so, Your Honor. And he's oriented towards the weapon. That's why the officers are going bonkers, because they can't see in front of him. So he's oriented, it's right in front of him. His hands are right there. Can't a jury then say he sees it? And he's actually moving towards it? His body was oriented towards the officers at the driver's side window. I mean, Well, whether he saw it or not really wouldn't matter. I mean, if you're aware it's there and you're making motions that are consistent with attempting to reach it, that could argue, and if the jury believed that, that would be highly probative of his constructive possession of the weapon, wouldn't it? Right, but I think that the key part of that question, Your Honor, is premise, if you're aware that it's there. So, you know, the jury then would be considering how likely it was he didn't know it was there in light of what were described as highly purposeful movements. I don't mean they were described in that conclusory way. I'm saying the jury could conclude that those were highly purposeful movements, right? I would say that if there was independent evidence beyond a reasonable doubt that he knew it was there, the jury could infer from the rest of the testimony that he intended to reach for it and had the power to do so. I do not, I would not agree with the characterization that the evidence independent of that was at all enough to establish beyond a reasonable doubt that he knew that gun was there in the first place, given that this was not his car, and given that it, I don't believe that it's a reasonable inference. Well, you know, the fact that it's not his car might suggest that he doesn't know its contents. On the other hand, his highly purposeful movements could suggest that he was well aware of the location of the gun, that it was his gun, although certainly the government didn't have to prove it was his gun, and so he was going for it. Well, two answers. I mean, both are possibilities, and neither, the jury wasn't required to accept either, I don't think, was it? Well, two responses to that. First as to whether or not it was his gun. There was no evidence below that the gun was registered to him, but perhaps to the meat of your question. In these cases, they usually aren't registered. I understand. Or whether it was his or not that he put it there. I mean, you know. There are no fingerprints. That helps you. I see that my time is up. May I answer your question? Sure, answer that question quickly. The answer would be that the court is not necessarily writing on a blank slate. In the court's decision in Bailey, the court had the opportunity to look at an affirmative escape attempt in which the defendant led the police on a high-speed chase, determined that that was equally probative that Bailey knew that the gun was there or that he was aware of other violations and found that that was insufficient to prove that Bailey knew that the gun was there. Applying the same logic, we would say that the government's evidence was inadequate. I'll preserve the remainder of my time for rebuttal. Thanks. All right, Mr. Glassman. And, Mr. Glassman, I'll tell you, I do plan to ask Mr. Cascio about the round issue a little bit, just so you know that that's going to come up. May it please the Court, Ben Glassman on behalf of the United States.  I think the bottom line is that there was testimony that a jury could have credited that the defendant was reaching for the gun that was right within... Can you explain that? Because I think maybe my sense is a little different from Judge Gibbons and Judge Kethledge, so maybe I'm not getting what happened or what the testimony is. I thought the way it worked is he's facing this way. They say, you know, get out, raise your hands, unbuckle, and all this stuff. And I thought he reaches left, away from the gun to start, right? That's right. And then I thought the officer's anxiety was all about this blading point, that at that point he's very slow, and he's obscuring from them what he's doing with his hands three feet away from the gun. Not exactly. Okay, so you're saying before the gun was identified through the back door, he had moved... Yes. But, I mean... He sort of follows it back into the role. Yeah, why don't I just demonstrate, since you'll see in the transcript that it says indicating ten times over, unfortunately. But you weren't there. True. At the trial, I mean. But here's how I read the testimony. Let's say that I'm Walker, sitting here in the car, and one of the closest proponents coming over to tell me to unclasp my seatbelt, keep my hands in sight. Well, the seatbelt clasp is here, so Walker goes, presses it, but instead of releasing it, right, keeping his hands in sight, so that the seatbelt recoils, which would be what a normal person would do, and especially when the officer's telling you to keep your hands in sight, he goes like this. Click. And at this point, when he blades his body like this, his hands are exactly where the gun is standing. Now, he's moving the seatbelt, but he's moving it slowly and deliberately and holding it. What does the testimony say about when the other officer yells gun? Where was he in this drama that you're creating? That would have been, I would say, a split second after Paponis, who is the officer at the window, reaches in and grabs his arm. At what point does she grab him, when he's back over by the gun? Right, yeah, because the testimony from, it was, Lowry is the female officer who, the way it came out was that Asbury comes up on the driver's side, Paponis comes up on the passenger's side, Davis is covered for Paponis, and Lowry comes up behind. Paponis is grabbing the arms as Lowry is just immediately after saying gun. Exactly, and because, as the detective was saying, the officers are freaking out because this guy is putting his arms over here, and at the moment, once his arms actually come over to where the gun is, Paponis, who has testified that he's not going to stick his head into the car for him to be grabbed, can't see his hands. And a split second at the same time, Asbury has testified that Asbury, on the driver's side, having already popped the driver out, has actually grabbed his gun and is screaming, show me your hands or you're going to be shot. And so, as soon as the defendant's hands are from the perspective of the officer right at the window, he can't see the hands. But he couldn't see them at the beginning, that puzzles me. Because he turned away. He couldn't see them then. I mean, if the gun had been on the left side, this is what I'm not following. And I'm not following the blading point, because it seemed the worst part of it from the perspective of the officer next to him at the door was the initial move. As he comes around, it's getting safer. Oh, no, no, no, no. I mean, that part doesn't bother the officer because you have to unclasp the seatbelt. He's wearing a seatbelt, and you have to unlatch it. So he says, unlatch the seatbelt and show me your hands. The problem is that Wolford does not follow that command. He unclasps the seatbelt and then carries it over so that both hands are now out of the side of the officer here. The clasp is on the right. The gun is on the left. Vice versa. Well, they're on opposite sides. Exactly. I mean, the bottom line is that there was direct testimony based off that description. Multiple officers reenacted it. But there was direct testimony that Walker was reaching for something. And as soon as they opened the door, they saw that that something was a gun. That distinguishes every case that the defendant relies upon on appeal. And actually, I mean, I would say to the court, don't take my word for it. That wasn't actually the defense theory at trial was that the officers weren't telling the truth about where the gun was. The defense theory was, oh, no, the gun wasn't where she said it was. The gun was somewhere in the back seat where we don't know who it was. If you look at the defense closing argument, the defense argued to the jury, but if that gun was right here and he's reaching for it, he's that close and he's in that kind of possession of it, why would they need to send the gun for fingerprints? That was the theory. And then the next page, he goes on to argue the defense theory was that the gun was actually in the back seat the whole time. Can I ask another question? Your brief seems to argue this as a constructive . . . I don't think it's your brief, to be fair, but it seems to argue this is an actual possession case. Isn't it more properly seen as a constructive possession case? I view it as actual. I think this is the sort of case where it doesn't really make a difference. Well, it may not, but I mean, it just seems to me . . . I mean, actual possession is you either got it at the time of the event or there's evidence from which you can draw an inference that you previously had it. Now, there may be evidence that he knew where it was, but whether there's evidence that he previously had it in his hand, I'm not sure, but it's a much easier constructive possession case because the hand actions would show his intent to exercise dominion and control over it. Well, see, now, as I understand the difference between actual and constructive, and it may, as I said, I don't think it makes a big difference in this case, but the way I think of it, I think the pattern instruction gives the example . . . If I've got this type of paper right there, even though it's right there, I'm in actual possession of it because it's within my immediate . . . I would disagree with you. See, I would disagree with you about the definitions. Okay, well, I think constructive possession is all about ability to control. Well, but the way I view constructive possession is that if I own that pad of paper and my colleague is out and I give it to him to hold out in the lawyer's lounge and I don't have immediate access to it or the ability to control it physically right now, I still have constructive possession of it because it's mine and I told him to hold it for me and I have the intention of reclaiming it. That's what I would call constructive. So tell me this. Had the gun been on the left side, then you would have said all these movements mean nothing and the case turns solely on its handle being up and right next to him. Right. That's Morrison. And you would say that's still possession? I would say yes, and I think that's the Morrison case, which is pretty darn close to the line. I think Morrison said, hey, this is a pretty thin case. Because I find myself saying, well, okay, well, maybe I'm not agreeing then. I find myself saying this whole movement thing is all highly relevant to what officers could do to protect themselves, seizing, grabbing them, all that stuff, no doubt. I'm just not sure what it adds to it. He still has possession of the seat belt. I mean, your whole conclusion is it's not like he let go of it. I mean, he's still, you say he's reaching for something when his hands are still on the seat belt. Okay. You unclasp the seat belt, you bring it around, all he has to do at that point is grab it. The seat belt, in your view, is a pretext to get your hands over it. Exactly. But he didn't launch into the pretext. He was told. Excuse me? He didn't launch into that. He was told to undo the seat belt. He was told to undo the seat belt and to keep his hands in sight. Let's put it this way. When was the last time you unleashed the seat belt by pushing it and just going like this? It's just not what you do. No one just lets it leak. Well, you let it, you unbuckle it, and you bring it over. Now, your whole point is he does it slowly. Your whole point is he does it slowly, right? No. Okay. No, no, no. Judge Sutton, if somebody unbuckles the seat belt by unbuckling it even really fast and brings it over like this, I've never seen it. I don't know if you have, but I've never seen somebody do a seat belt that way. Judge Sutton is extremely meticulous about releasing the seat belt. I've had more experiences with this than you have. Fair point. Fair point. But in the context of this case, remember that it is also, at the same time, this is in defiance, direct defiance of what the police are asking him, telling him to do, many times over. It's an extremely tense situation. So it seems like it's pretty darn deliberate. Now, even if you... Well, it's tense in every direction. I mean, you're being a little bit of a government lawyer there. I mean, you're surrounded by five cops, and everybody's yelling at you. You're going to move slowly. It does strike me that people move slowly when they're being yelled at. They didn't have any... Armed officers. They had no problem with the driver. Yeah. Well, one out of two proves my theory. Let me ask you... Yes, please. I want to ask you a question about the ammunition. Absolutely. If we... Yes. Okay. So the agent testifies that the round was made in Russia because of the stamp. And the defense points out that the stamp is only... It's on just a component. Your response is that the agent also said these are cheap rounds, and it's unlikely that somebody would reload these as opposed to just buying new ones. All of that is almost entirely a correct reflection of the record. I would make two amendments to the testimony, which only takes up three pages, so it's easy to check. But the agent didn't say, I believe these rounds were manufactured in Russia because of the casing. He said straightforwardly, after being qualified to give an opinion, that his view was that these rounds were manufactured in Russia, the country. But it's because of the stamp, right? He didn't say any other basis but other than the stamp. That's right. So on cross-examination, there was this possibility introduced of reload. Now, of course, there was no actual evidence whatsoever of the possibility that these had been reloaded. That was a line of attack on cross. The only other point I would make is that on redirect, it wasn't simply that he explained the cost, but also that the first question right off the bat was, in his experience, he'd never seen Wolf reloaded. So my question is, the testimony about never seen Wolf reloaded, it would be sort of cost-foolish to reload these things. That's enough for a jury to find beyond a reasonable doubt that it wasn't reloaded. Yeah, the jury could use its common sense that this agent who sees this stuff all the time, has all this experience, has never seen it, wouldn't make sense cost-wise to do it, and there's no evidence that that actually was done, that that would be sufficient evidence to find that those particular rounds had, in fact, been manufactured in Russia as the agent testified. Okay, that's my question on that. Yes. Well, I would just like to add a couple points on that since we are discussing it. I do think that you can't make a constructive amendment claim without having the jury instructions. I think that that point was made in our brief, and I want to stand by that. I don't see how you could say that the defendant... But isn't that a form of forfeiture point? Yes. Okay, so I mean, I would have thought that if that's true, I'm not sure what it buys the government because I would have thought what would happen is for us to size up all the plain air stuff, we'd then say, well, shoot, we're going to have to send it back, get this transcribed, and figure out how plain the air was, how much of an effect it had. So I don't know how it helps you. Unless you're going to say it amounts to waiver. No, no, no. I'm troubled by what it does to the plain air standards. No, it says that there was no... The claim of a constructive amendment would be subject to plain air review. Right. And so to the extent that one thinks that... To the extent that one thinks that a constructive amendment would require reversal, that would not be the case under a plain air standard. Without the jury instructions. Oh, I'm sorry. I thought the point you were making is you can't do this if you don't go through the trouble of putting the jury instructions in the record and then explaining how this misfired. Right, okay, so then I guess I would say maybe I should put it in terms of waiver. It's a waiver in litigation in terms of at the appellate level that we've got no argument about what the jury instructions... Waiver is knowing you know what's in front of you. Waiver is at the trial level the judge asking you directly, are you going to do anything about this, and you say no, that's waiver. This seems very much like forfeiture. It's a forfeiture if you don't object at the trial level to the jury instructions, and I don't think that there was any objection raised. Well, what's your case that says if you don't put your jury instructions in, this kind of a variance setting, it amounts to waiver? Well, no, I would just say that it's in the nature of the articulation of the test itself. What is a constructive amendment is when the nature of the evidence and the jury instructions authorize conviction for something other than what was charged. If we don't know what the jury instructions were, then there's no way to say that the jury instructions authorize conviction for something else. There's all these arguments that I might be batting back and forth with Judge Catlin. And you could view it either as a failure to adequately preserve the record for the appellate point, or you could view it just simply as a failure to adequately develop the argument because you don't identify what the flaw in the jury instructions was. Right. Is that the... Because I think... Let's just put it, for the sake of argument, let's just assume I think of it a forfeiture. Let's just start, go down that road. Then the only way to deal with this, though, is to go back and get the instructions to figure out how this all worked. On the contrary. The way to deal with it is to say that if there was, if we're troubled at all by whether there was a constructive amendment or a variance here, it's sure not an obvious one. But that's my point. You can't know without the instructions. So you fail under plain error. No, but I mean... It's obvious because there's a deficiency in the record which we can remedy, in which case it might be obvious. Yeah, you're bootstrapping the forfeitures, I think. I mean, I think you're right. If you can call it a waiver, I think that's pretty extraordinary that you could give it that label. You're right. If it's a waiver, end of story. But if it's a forfeiture, of course they don't have the record. That's the whole point. They neglected to do this. And, of course, it means not only do you not accomplish anything on direct review, because we have to send it back, you accomplish even less when it comes to 2255. Yes. I guess the trouble that I was trying to avoid in part was getting into a discussion about whether we have to say that Chambers is right or wrong, whether we have to distinguish Chambers in this case, whether Chambers, all that stuff about whether a constructive amendment mandates reversal is actually an accurate statement of the law as it currently exists. And so I'm looking for a way to make the court's life easier for it. But perhaps I'm making it harder, and I should just have stuck with my answer to Judge Kethledge. I made the same mistake with the reaching and the seatbelt. I guess I would just point out that, yeah. Well, I'm going to ask Mr. Cassio about the point, the thought I just had, not you, Mr. Glassman. So unless there's something else for you.  I invite the court to affirm. Mr. Cassio, what I wanted to ask you about is I have looked, in light of this most recent discussion, I've looked back at the constructive amendment argument in your brief, and it appears to me that it's really a repackaged argument about sufficiency of the evidence. Can you tell me why it isn't and what you contend specifically happened here that constituted a constructive amendment? Right. Well, in a manner of speaking, your characterization of it as a repackaging of sufficiency of the evidence argument is frankly fairly accurate. Well, that's what I thought. It's really not a – The contention is that there was a fatal variance between – I mean, fatal variance may be the easier term to use here than constructive amendment, which I'll admit doesn't fight consideration of jury instruction. But you don't have a constructive amendment argument unless you're – if I understand the argument, unless your argument is correct that the government somehow failed to carry its burden of proof with respect to the ammunition by only proving that the casings bore the stamp that would indicate manufacture in Russia. Is that right? That is correct, Your Honor. Okay. So it's really not – when it comes right down to it, it's really not a constructive – it's a constructive amendment argument that depends on a finding as to insufficiency of the evidence. In a manner of speaking, I would frame it as there was a fatal variance between the evidence that was presented at trial and the charges in the indictment. The evidence presented at trial indicated that the shell casing – Well, and poor put another way, the evidence presented at trial was insufficient to prove the charge in the indictment because the government somehow had to prove that each component of the ammunition was manufactured. Well, but what happened in that Fifth Circuit case, though, was a constructive whatever, right? Amendment? That is true. And the reason you're in this box is because actually just a component is defined as ammunition. And so if he had just had the casing, he would have been guilty of this crime. But, you know, so you can't just argue insufficiency outright. Instead, you have to say, well, that's not what you charged him with. You charged him with the round. You didn't prove the round. That is correct, yes. So that's why we're here. But aren't all fatal variance cases sufficiency cases? In other words, there's no prejudice if there was sufficient evidence. I mean, even if they changed the game by instructions that were different, if the evidence supports what you were indicted for, you would always say no prejudice. So it's always sufficiency, isn't it? Well, I disagree, Your Honor, in the sense that Chambers says that, you know, a disparity between proving a part of a round versus proving the entirety of a round proves a completely different item from the indictment. In that sense, the variance would not merely be a variance but a fatal one. But Chambers doesn't say if you prove that just the casing traveled in interstate commerce, that is not proof of this crime. It was just not what was charged there. That is correct. Had the government charged properly, this issue would not be in our briefs. Okay. Thank you. Well, we appreciate very much the argument you've both given. We'll consider the case carefully. Mr. Cassio, we're particularly grateful that you accepted the appointment in this case under the Criminal Justice Act, and we're appreciative of your advocacy on behalf of Mr. Walker.